Last case we have this morning which is Nicole Patsalides versus the City of Fort Pierce. Good morning, Marcus, may I make a plea to the court? William M. Long and Karen Kuhlman M. Long on behalf of Nicole Patsalides. Your Honor, a reasonable jury could infer that when a police officer who is told the City of Fort Pierce that he is on a pharmaceutical induced sexual conquest and that he is hunting women, that when that police officer puts his hand, reaches through a police cruiser door and puts his hand on the thigh of a young female officer that he is making an unwanted sexual advance motivated by her sex and that the city is responsible because under advance. Well, help me with this, the appellant recounts about ten instances as best I can tell in which Pate touched or grabbed the plaintiff's arm. As best I can tell and help me with the record if I have this wrong, there's no evidence that the touching itself was accompanied by any sexual threat, innuendo, reference of any kind and that when she was asked if Pate had ever spoken to her about anything, quote, sexual in nature or flirtatious, those were the exact words, she said, I don't know if he tries to flirt, I don't pay any attention. Is there any indication that any of the touchings or grabbings of her arm had anything to do with gender or sexual harassment or anything like that, that you can point me to in this record? Your Honor, the most egregious episode was when he reached through the police car window and put his hand on her thigh. That act alone is different in character from touching her arm. I think that's right. But I'm asking a slightly different question. I'm just asking whether there were any words either specifically or in substance that suggested that the touching of the arm, et cetera, had anything to do with, you know, gender, gender discrimination, sexual harassment, flirting, anything like that. He said nothing to her about it, but he also touched her one time on her chest near her breast, near her vagina and near her breast and in the time of the thigh. The, Officer Pate was not a talker as much as he was a toucher. Let me ask you about touching the, he touched the badge as I recall, is that right? I believe so. The red brief, if I am not mistaken, says that she actually said that on that occasion he had not touched her. Is that not true? What I'm gathering is that she said that when she wrote that, wrote out, you know, the list of six things and trying to remember everything that happened. And then she probably later saw on the video that he had in fact touched her badge there. Can you help me on the facts? I apologize, Your Honor. I don't remember seeing that in the brief. He did touch her badge one time and he touched her thigh. The others were just, you know, touching her, grabbing her, just being handsy, being always there, lurking, backing her up when he did not need to, calling him to back her up when she did not need to, just being ever present. And the reason, the reason the Well, let's assume for the purposes of just a cut to the chase, Mr. Amlin, let's assume that you're right. There's enough here to suggest that whatever harassment there was was based on sex. Let's just assume that based on gender. You've got to then establish that the conduct itself was either severe or pervasive. How do you establish, given our case law here, that this conduct was either severe or pervasive? Your Honor, I think You have ten instances over a two-week period. Does that constitute pervasive? It certainly Because I'm not sure that that's what you're arguing. And if you are, you can point me to where you make that claim. Your Honor, it doesn't, it constitutes intense conduct. Okay, so we're not talking about the frequency within the time frame. We're talking about the nature of the contact, which you suggest is severe. So it seems to me your argument is a severe argument, not the disjunctive that it was pervasive. Do I have that right? Correct, Your Honor. Okay, so tell me why these ten instances, seven or eight times the arm or the shoulder, once touching the badge and once reaching in and touched the thigh, unaccompanied by any comment at all in context, amounts to severe, sufficient to alter the terms and conditions of employment? Because this Court has held that a single incident of carving the words porch monkey in the workplace No, I don't dispute that a single act can be more than sufficient. And we've said it. But the question is, even taking these ten acts in concert, what makes them arguably severe, sufficient that a jury, if they credited them, could infer from them that the conduct amounted to an alteration in the terms and conditions of the workplace? Because the way that she reacted in the workplace was to stop making traffic stops, stop accepting calls for service. Right, but remember, you've got to show both subjective and objective. Yes, and I have no doubt that you've satisfied the first burden on the subjective. I'm worried about the second one. Would an objective person in those circumstances characterize the ten touchings, unaccompanied by anything else, as amounting to severe harassment, altering the terms and conditions? Could a jury draw that inference from those facts? I think each juror can think of somebody putting his or her hand on his or her thigh and say, that's it, that's too much. So standing alone, touching the thigh was enough? I believe so, Your Honor. Okay. Enough so that she would not take calls, which was her duty, respond to backup calls? I did not say that she did not respond to backup calls, Your Honor. I said that if a call for service would come out, she would defer on taking that because she did not want Fred Tate showing up there and backing her up again. He was all over her. Another thing she said was that she did not make traffic stops. She would have had a duty to make? You think a reasonable officer would have? I think a young woman who is saying, this guy is creeping me out, I think she's going to do anything she needs to do to stay away from this guy. This guy is… Let me ask you what I think is the crucial question. It's undisputed that nobody in the department knew about Tate's actions with respect to this plaintiff. The imposition of liability on the city is based solely on the past actions that Tate had and that the city did deal with. The implication of your reliance on that, it seems to me, is this, that your position is that the only reasonable response to Tate's past actions was that they should have fired him, or at least they should have done so much more that he would not have been there to allegedly harass plaintiffs. It seems to me there are three problems with your implication, which you never really, well, that's the first one, you don't really argue that. The second one is you don't really have any evidence of that. You don't really go into precisely what the facts were with each of these prior incidents. Incidentally, the red brief says there were only two that were actually found to have sexual overtones and that both were dealt with, one with a written reprimand warning and one with a three-day suspension and one with a five-day suspension, which they, I think, say was not even proved to be sexual but insubordination. Indeed, it's very unclear exactly what the prior incidents were and exactly what the investigation was and exactly what the remedy was even, which is the second point. You did not prove that the city's response was so unreasonable that they should have either fired him or done something to make sure he would never do it again. The third thing is that we have a Baldwin case that expresses great reluctance to flashback and second guess what an employer does do when the employer is investigating. It seems to me you fail on the imposition of liability on the city, even if the harassment were severe. Your Honor, the Baldwin case was when the complainant refused to attempt to conciliate this. I understand that and it was in the Farragut defense too, but the court held we are reluctant to flashback and second guess the employer's investigation. In the Farragut defense, our situation with the prior offense would be a fortiori. What about the other two? You don't even argue that the investigations were inadequate and so forth and you don't really pursue the evidence of what happened and why and why it was so unreasonable. Don't you have to do that? Your Honor, the investigations were quite adequate. The investigations— Now we're referring to the past ones before this incident as opposed to the ones that flow after she brought it to the attention of her superiors. The investigations were quite adequate. The investigation showed that while he is at the St. Lucie County Dispatch Center and he's walking behind the console where there's an emergency dispatcher there, he reaches over there, sticks his hand not just in her shirt but inside her bra and he still has a badge after this? He still has a badge and he's back on duty. Didn't they suspend him without pay? I thought what the city did over a period of time when they plainly were aware of the past incidents where he had engaged in sexual misconduct, there wasn't the kind of ambiguity you have perhaps in the present set of events, but in that circumstance what they did is, one, they issued warnings on more than one occasion. Two, they then sent him on for counseling. And three, they then suspended him without pay. They did all of those things, right? They gave him either a five or ten-day suspension. They did all of the things that I've just summarized, correct? Yes. The only thing they didn't do was fire him and then when this incident was brought to their attention, they fired him flat out. Is that a fair statement of the facts? Yes, Your Honor, but they did before between their investigations of the other incident or actually during the investigation of the other incidents is when he comes to the internal affairs sergeant and says that he is on a sexual conquest. You know, he is hunting women. He is animalistic. And they send the guy back to work. So your whole argument turns on the single proposition that notwithstanding demanding counseling, warning him, and suspending him for two weeks without pay, that their failure to fire him based on the past record is fatal and yields liability. Even though in the context of these claims by the plaintiff, they acted promptly and in every way that they should have and you concede as much. I do because they finally are there. Okay, so the gravamen of their wrong turns on the singular fact that they failed to fire. Is that correct? Yes, Your Honor. Okay. This is not a Baldwin situation. He's not denying and they can't figure out who's on first. This is a situation where Fred Tate is a clear and present danger to women on the police department. And the fact that they say he never did this on the job. The dispatcher, she's saying they're taking 911 calls and this guy is grabbing her breast inside her bra. And he's telling them that he is hunting women and they put him back to work. And, Your Honor, that makes the city negligent. Thank you. Thank you. Good morning, Mr. Noah. Good morning. May it please the court, I am Doug Noah. I'm here on behalf of the city of Fort Pierce. I think the first question that I would like to turn to is the question, does one incident of touching her thigh. Let's sort of work backwards for us. Let's start where Mr. Amlong led off. And let's pass the question of whether the conduct constituted sexual harassment. Let's pass whether it was severe or pervasive. And let's talk about the response of the city and their liability where the harassing employee is the victim's co-worker. They don't dispute that your client's action was prompt, remedial, and proper once the plaintiff brought the stuff to their attention. They don't dispute this employer acted with great speed and terminated him. So the only question that I want to start with is whether or not they did enough in the past or whether their failure to fire could yield an inference of liability. Sure. And let me frame the question even more precisely than that. What did they know that Tate did prior to the present incidents given rise into this lawsuit? Summarize for me his conduct. Sure. The first thing that they knew was that when he was in a dispatcher's office, which this is not the city's employment environment, this is over at the sheriff's office, that a complaint had been made about him placing his hand in a woman's shirt. Judge, I only hesitate because I'm not sure how clear this has been developed in the facts, but I do know what the backstory is. No, no, I just want to know what this record reflects. That's all. So what the record reflects is that they would have had knowledge of that to which he pled. And who was the woman? It wasn't a co-employee. It was somebody who worked for Seminole County, or not Seminole County, excuse me, but for the county's dispatch office. So he just gratuitously essentially assaulted her. Well, we don't know because in that particular case. Well, what do we know? We know that a complaint was alleged saying that he placed his hands on her breast, right? Reached into her shirt. In her shirt, correct. Okay. Then what did the city do based on that? So the. Was there an inquiry conducted by the city of Fort Pierce? Exactly. And so my understanding is that. Based on the record. Based on the record is that she did not go forward with the complaint. He admitted to the wrongdoing, but he provided mitigating circumstances. He said that he explained an accident that he was hugging her from behind in his shirt. And his hand went into her shirt. And there is a process under Fort Pierce's police department. When an officer admits to a wrongdoing, then they simply. That ceases the investigation and they administer discipline based on. What was the discipline? The discipline on that was a written warning. Then there were. Based on his account that it was an accident and not an intentional act. Correct. And the failure of the complainant to. Okay. So that's one. What else was there? So then the second. Issue that arose was. A. A citizen, while he was at a bar, made a comment of being. That made a complaint that he made a comment that she. He was able to see through her. Shirt and see her bra. Touched her butt area and referred her. Referred to her as baby and Han. So that allegation was investigated. It was sustained and he received a three day suspension for that. And the touching was of her derriere. It's my understanding. Yes, sir. So, and then the, the final thing was their work. And what was the penalty imposed for that one? Three day suspension. Without pay. So then the. Close in time. What's the timeframe in relationship to these acts? The first incident occurred. In 2012. And this was later in two to all of these incidents occurred in 2012. Okay. And what's the third one? So the third one is there was an original complaint. That. He had gauged in some harassing. Behavior. Again, it, the complaint was investigated. The women in that complaint. One said that there wasn't recanted said that there was no harassment. The other one refused to be interviewed as a witness. So there was never a. A sustained finding of some harassment. And that, again, was not in the workplace. That had to do with residents that the department serves. The. What ended up happening is part of that investigation. There was a, a consensual incident. It's referred to in the plaintiff's brief. But there was a consensual incident where he was kissing another woman while he was on duty, which of course violates our policies and procedures as well. And so, although there was no sustained finding of harassment. He was, he received a, an additional five day suspension for conduct on because that was the fourth act. That was the third act. I think the third act was two women had complained. One recanted and the other refused to be. Answer questions. Well, yes, judge. If you want to call a complaint. Some sort of, of knowledge on the department's part. But when we talk about what are. I'm just trying to find out what happened here. Is this. Kissing of another woman while on duty different from the complaints that were leveled by these women who recanted or refused to be heard further? Yes. Or is that the same complaint? It's, it arose out of the same complaint. I'm sorry. It arose out of the same, the, out of the investigation of the same complaint. Was that related to that saloon also? I didn't believe so judge. No. Okay. All right. Go ahead. Okay. So those are the incidents. So now, since we have a. About the incident, about the, what, what, which, which one did he get the five day suspension for? That was, it started out with a complaint from a resident, but ended up that there's a number of things. He showed somebody his taser. He pulled his taser out of his holster when he wasn't supposed to. He, he was kissing a woman while he was on duty. And that's what resulted in the five day suspension, the accumulation. It was a comp, it was, it was a combination of the kissing and wrongfully using the taser. And there may have been other things as well. Yes. And when did they order counseling in the sequence of these events? That I'm, I'm not particularly. They did order counseling, did they not? What, what I'm aware of is that in, in these incidents, he, he discloses. I want to make sure that I'm answering your question, judge. I'm getting a look. The answer to your question is I'm not aware of his, of the counseling. I am aware that. I thought that, I thought that the city of Fort Pierce had sent him. The police department had sent him for counseling as well. And I apologize. They warned him, they counseled him and they suspended him twice. Once for three days, once for five. Correct. Maybe I've misapprehended that. I am, I remember everything that you're saying. Except for the counseling. Think about the EAP. That's, I just. Okay. Okay. All right. So your view is that none of this in the aggregate was sufficient to yield the demand that he had to be fired. Or put more awfully, a jury could not find liability against the employer simply because they didn't fire him under these circumstances. Correct. And why? Because that element goes to whether or not there's a basis for vicarious liability. And how is vicarious liability determined in this context where it's a co-worker and there is no tangible employment action? We, the first inquiry is did we know or should have known, which we clearly did. The second inquiry is did we take prompt remedial action to stop it? There is nothing in your jurisprudence. I don't know of any guidance that you have offered us to tell us when does a zero-tolerance policy have to go into effect. And so to. By zero-tolerance you mean requiring firing. Correct. And I don't know of any guidance that you've offered us to tell us when is something so severe that we're unreasonable if we don't fire. What I do know is that what we should have done is going to be determined in the context. And this is a context of a law enforcement agency where police officers have enhanced due process rights that are protected by the Law Enforcement Officers' Bill of Rights and that they're entitled to be told what the offense is. They are entitled to be investigated. There are union agreements that we have to comply with. There's a lot of information that I think would preclude the court, this court, from reaching a determination that as a matter of law we had a duty to terminate in this particular case. So if I've responded directly to the court with those things, there's a couple of other issues that have come up. I want to ask a couple of questions. Sure. He didn't really argue in his brief to us that that's what should have happened. I'm kind of doubtful that he really challenged in the district court making the argument they should have fired. They didn't do enough. It was unreasonable what they did do. Did he argue that and did he pursue the evidence? If he had pursued the evidence, we'd know a lot more details about these prior investigations. The answer, did he pursue the evidence, the answer is no. I agree with you. But I think it's inferred in their argument, Judge. They say two things in their brief. They say, you know, here we have a known predator. We should have warned her that this guy's a predator. They say that in a vacuum without realizing that his confessions about why he had these desires was because he had been prescribed testosterone. These are medical conditions. And, of course, we have medical confidentiality laws that we have to comply with and how we deal with those things. But to answer your question directly, Judge, I do think it's inferred that we didn't do enough. I don't think that there was any factual development of that argument about how we would . . . you know, why they come to that conclusion. Appreciate you, Kanda. Sure. Is there any evidence that he was still under the influence of that medication causing the kind of problems when he was allowed to return to work after that? Just the opposite. That issue was handled like any ADA issue would be handled. When he talked about secondary effects to his testosterone, at that point he was required to come back with a physician's note that says that he had been balanced out or that he was fit to return to work. In his reply brief, he says that there's no evidence about that physician's note. I can't point to the record right now. I know that that's what occurred, Judge, and I apologize if the record below is not clear on that. The one thing that I'd really like to . . . or a couple of things that I'd really like to address.  Is touching a thigh through the car, the way it was described in this case, is that one incident sufficiently severe to constitute sexual harassment so the case goes to a jury? Mendoza clearly disposes of that issue because if you remember in Mendoza, in addition to the other conduct that was complained of, the perpetrator comes up to the plaintiff behind a fax machine. His hip comes into touch with her hip. He places his hands on his shoulder, and when she turns around to look at what's going on, he's smiling at her. There's much greater inference in a case like that of severity. Anytime the genitals are going to be close together, I would think, certainly creates that type of inference when you have hip-to-hip. But if it was insufficient in Mendoza, you all have spoken, that is clearly not going to be severe in this particular case. And then when you look at the cumulative of the evidence, not only does it not touch on sex, and it's such an important concept, because Title VII, of course, disparate treatment is what harassment arises out of. That's why they have to demonstrate that the treatment is different for women. So in the case of the car, there is no comment. Pate denies that it occurs. She never describes the incident as being groped, being fondled, words of that nature. She uses words like nuisance and one is escaping, annoyance, or words to that effect, or creepy. Not creepy, but she says that it was also inappropriate and things of that nature. So we don't get a characterization that these incidents were related to sex. And with that, my time is up, unless there's questions. I want to be respectful of the court's time. There's a lot of things we didn't cover, but I think that the court's decision below was well-written and I think that he addressed many of the issues I was going to address. Thank you. Thank you. Did you ever argue in district court that the past behavior of the city was sufficiently inadequate because they didn't fire him to yield an inference of liability? That that was what was wrong, they didn't fire him? If you will look at docket entry 785, our statement of facts beginning at page 6, paragraph 385 and going through. That's docket what? Yes. Docket what? I did not, I faulted them for not warning them about. But you were referencing which docket, that was docket entry 75? Yes. At what page? It pages 6 through 9, paragraphs 35 through 43. I don't quite see how one can accidentally get one's hand inside a woman's bra. I mean, maybe inside her shirt, but inside the bra? No, no, but the question that precipitated this answer was did you argue in the district court that the city's response was inadequate to the past events because they didn't fire him? No. That's what they should have done. No, because I do not believe that it is my role, it is a title. I'm just asking whether you, I just asked whether you did. I did not, I think that's precluded by. But that's your argument today is they did everything short of firing him, right? They counseled him, they warned him, they warned him on repeated occasions, they suspended him once for three days, then they suspended him once for five. And the five day suspension was for insubordination because he had gone back to the bourgeois saloon whose owner had said keep this guy out of here, he is harassing my female. All I'm getting at with the question is this. Short of firing him, was there anything else the city could have done and that its failure to do was actionable? I don't know that he was ever given training. I don't know how clear it was ever made to him, keep your hands off women. It obviously did not seem. Does the record reflect the nature of the warnings he was given? No. And what they would do is they would put him out on paid leave for as long as it took to do these investigations. So he's sitting around the house collecting his paycheck and then he gets the three day suspension and then he gets five day suspension or a written warning and he's off and running again. It was during the last investigation when he said that he was on this sexual conquest based on testosterone. People who lift weights use testosterone all the time. You don't have people running around LA Fitness grabbing other people because they've taken testosterone. There is no medical evidence that that was causing anything. Let me ask you this. Did the district court get it right when he wrote in his opinion that Pate was the subject of at least nine complaints involving sexual remarks or unwelcome sexual advances dating back to 1997? Of the nine, four were unfounded or not sustained, five were sustained, and then they talked about the remedies. Is that an accurate statement? I believe so. Okay. Final question because there's not a lot of time here, but I want you to go back. Why is the thigh touching enough to make this actionable, to make this severe under our case law? Because the only reason he did not do more is he didn't have more time. She complained. We're going to yield liability on the basis that he might have done more if he had the opportunity to but didn't, and he didn't say I'm going to do more but for the opportunity. He was progressing. The thigh grab was the last of the ten. It was the last of the ten. He was building up. Putting your hands on somebody's shoulders, bumping your hip against somebody is significantly different than reaching through a car door where somebody is sitting down, reaching down to a woman's lap and putting your hand on her upper thigh. That trumps Mendoza. Mendoza said you can't have innocent stuff. You can't say he's looking at me funny. He's saying stuff. Just one final factual question. Is there anything surrounding the thigh touching that accompanied it, anything else factually that she says? That day? As to that incident? No. Any comment, how he touched, what he did, how long, anything other than he touched her thigh reaching through the window of the police car? They were talking about her computer or something. He reaches through and reaches down and touches her thigh, and then she puts the car in gear and pulls away from him. Okay. Thank you. Thank you both very much. This court will be in recess until 9 a.m. tomorrow morning.